[Civ. No. 20758.   Second Dist., Div. One.   July 26, 1955.]

BERTHA VELLEMAN, Respondent, v. SIDNEY STERN, Appellant.

Jerry Rolston for Appellant.

McLaughlin & Casey and James A. McLaughlin for Respondent.

WHITE, P. J.—Plaintiff instituted this action to recover possession of certain government bonds which she had purchased and caused to be delivered into the custody of her brother, defendant Sidney Stern. At the commencement of the trial the action was dismissed as to all defendants except Stern.

As to the factual background surrounding this litigation, we consider the following to be a fair epitome thereof as reflected by the record. Ten of these bonds were Series G, having a maturity value of $18,000 and 10 were Series E, having a maturity value of $10,000. At the time of trial the total cash surrender value of these bonds was $26,100. Plaintiff is a widow 70 years of age, and defendant, her brother, also unmarried, is 68 years of age. All of Series E bonds were purchased between August 1 and October 31, 1949, and at the time of such purchase, plaintiff caused the bonds to be issued in the names of ''Mrs. Bertha Velleman or Sidney Stern,'' and to be delivered to defendant.

All of the Series G bonds, except five, were originally issued in plaintiff's name, but thereafter and prior to March, 1949, she caused them to be reissued in the names of ''Mrs. Bertha Velleman or Sidney Stern.'' The other five Series G bonds were originally issued in the names of those two.

Around March of 1949, plaintiff caused all of the Series G bonds to be delivered to defendant, at which time she instructed him to keep these bonds in his safe deposit box at the Farmers and Merchants National Bank of Los Angeles until plaintiff's decease. Prior to the delivery of these bonds to defendant, plaintiff had told him that she intended to deliver these bonds to him because she had been advised that she could save inheritance taxes thereby.

Prior to such delivery, plaintiff had kept these Series G bonds in her custodian account with the Corn Exchange Bank in New York City. Neither plaintiff nor defendant filed any gift tax returns as to this transaction. Interest on these Series G bonds has been paid by the Treasury Department at regular intervals directly to plaintiff.

As is usual in cases of this nature, the evidence is conflicting. We deem it unnecessary to here set it forth in detail. Suffice it to say that in response to the question whether she intended to make a present gift of the bonds, plaintiff testified:

''I gave him the key to this vault and told him about the bank book and the bonds, and said, 'If I take sick in

California, you may use what you need to pay my expenses, if I die, for cremation, and my body to be sent or ashes to be sent to New York. And if anything is left, you can keep what is left over.' ''

On January 12, 1950, plaintiff wrote a letter to defendant on the reverse side of which appears the following recital:

''same as vault and contents. If anything happens to me—withdraw all, its yours.''

During the latter part of 1951, after plaintiff became ill, she wrote defendant requesting him to send her the savings bank book which was also delivered to him. With the return of the bank book defendant wrote his sister in part as follows:

''I have always considered this a sacred trust. A fund for your benefit should the need arise. So far as I am concerned I had no intention to touch one penny of this money while you are alive, and as you can see from the bank book, it is all intact.''

On May 9, 1952, plaintiff wrote a letter to defendant describing her ill health and her need for money in which she said:

''Please send me those Series E bonds. I must have cash.''

Receiving no reply to this communication, plaintiff again wrote defendant saying that she had received his several post cards, but was hurt at not having received a reply to her request for the bonds. She closed with the request, ''Please send my property to me immediately.'' Upon receiving no reply to this letter, plaintiff thereupon referred the matter to her lawyer in New York, who, in November, 1952, wrote two letters to defendant, which were also ignored by the latter.

Defendant testified that when plaintiff told him she was ''going to give away all of her property while she was alive,'' he remonstrated with her and urged her not to do so. That plaintiff insisted, saying that, ''I (defendant) formerly was a sole beneficiary in her will, and one of the executors, and she is giving me this part of it, giving me $50,000.00 as part of it in consideration that we have been very, very close throughout our entire lives, and further consideration that I at several times have given her thousand-dollar bonds, and further consideration that at one time I gave her over $10,000 and gifts too many for me to occupy his Honor's time to enumerate here.'' That he accepted the bonds as a gift only after he had vainly tried to dissuade her from ''giving her money away.'' Defendant insisted that nothing was ever said

to the effect that the bonds were not to be his until the demise of plaintiff.

Another witness, Mrs. Sarah Quadow, a very dear friend of plaintiff, testified that late in December, 1949, at a luncheon meeting, plaintiff told the witness that "she (plaintiff) had given her brother Sidney (defendant) $50,000.00."

Upon the foregoing conflicting evidence the court found that in delivering the bonds, plaintiff ". . . instructed said defendant Sidney Stern to keep and retain the said bonds in his safe deposit box at the Farmers and Merchants National Bank of Los Angeles until plaintiff's decease. That the defendant Sidney Stern accepted and received the said bonds and did place them in his safe deposit box in the Farmers and Merchants National Bank of Los Angeles and has retained the said bonds at all times since and does now have the said bonds in his possession in his said safe deposit box." "That plaintiff did not at any time intend to make an immediate gift of the said bonds to defendant Sidney Stern or to transfer the ownership of said bonds to defendant Sidney Stern until after plaintiff's decease. That plaintiff did intend that upon her decease such of the said bonds as remained in the defendant's possession should become the property of and belong to the defendant Sidney Stern." "That prior to the filing of this action, plaintiff, on numerous occasions following a date on or about the 9th day of May, 1952, did request and demand of defendant that he return the said bonds to plaintiff, but that defendant Sidney Stern has at all times failed, neglected and refused to return the said bonds or any of the same. That the said defendant has no right, title or interest in and to the said bonds or ownership therein, and plaintiff is entitled to the possession of all of said bonds." Judgment was accordingly entered that plaintiff have and recover from defendant possession of the bonds in question. From said judgment defendant prosecutes this appeal.

The basic question presented to us is whether or not the evidence supports the finding that no present gift of the bonds had been accomplished. This brings us to the inquiry of whether the legal incidents essential to make an *inter vivos* transfer or completed gift are here present. This would depend upon whether having created a joint tenancy with respect to securities, the donor is precluded from proving that the transaction was only a device for passing title upon her demise, and if not so precluded, is there sufficient substan-

tial evidence in the record to sustain the determination of the trial court that there was no completed gift of the bonds.

■ As to the first of these questions, we are satisfied that during the lifetime of the two parties, either would have the right to establish the true intent and purpose of the joint tenancy (*Spear* v. *Farwell*, 5 Cal.App.2d 111, 113 [42 P.2d 391]). ■ And the question as to the intent of the respondent in causing the bonds to be issued to herself and appellant was one of fact for determination of the trial court (*Blankinship* v. *Blankinship*, 104 Cal.App.2d 199, 203 [230 P.2d 869]; *Paterson* v. *Comastri*, 39 Cal.2d 66, 73 [244 P.2d 902]). ■ The record here contains substantial, though contradicted, evidence, as to the respondent's intent not to make a completed gift of the bonds to appellant, but to formulate a plan whereby the bonds would become the property of the appellant upon the death of respondent. In the instant case the trial court chose to believe the testimony of the respondent coupled with inferences drawn from documentary evidence as showing an intent upon her part to give the bonds to appellant in the event of his survivorship, and hence there was present in the transaction all the essential qualities of a gift *causa mortis* which respondent could revoke in her lifetime and which would not take effect until her death if not previously recalled. Under such circumstances, the control of respondent over the bonds was unlimited, and only at her death would become the absolute property of appellant if he survived her. Until her demise the gift was not consummated and respondent retains the entire title.

As to the aforesaid second question presented, it follows from the foregoing conclusion at which we have arrived, that the evidence is sufficient to support the findings. As pointed out by respondent, if she "had intended to make a present of the bonds, it would have been a very easy matter for her to have the bonds issued in the name of appellant alone and to deliver the possession thereof to him. The fact that she placed them in the names of both herself and appellant indicates that she was attempting to effectuate a means whereby such of the bonds as had not been used by her would vest in appellant upon respondent's decease." Also noteworthy is the conceded fact that respondent purchased all the bonds with her own funds and, as heretofore pointed out, the interest on the Series G bonds had been paid by the Treasury Department at regular intervals to respondent.

■ Where a judgment is challenged on the ground of

"insufficiency of the evidence" an appellate tribunal in reviewing the evidence must resolve all conflicts in favor of the respondent, and all reasonable and legitimate inferences must be indulged in to support the judgment if possible. In other words, when a judgment is attacked as being unsupported, the power of the reviewing court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the duly constituted arbiter of the facts. And, though two or more inferences can be reasonably deduced from the facts, the reviewing court is not authorized to substitute its deductions for those of the trial court.

With these well settled rules in mind the judgment herein must be affirmed. It is so ordered.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied August 16, 1955, and appellant's petition for a hearing by the Supreme Court was denied September 21, 1955.