[Civ. No. 23956. Second Dist., Div. Two. Dec. 24, 1959.]

Estate of IDA MAY HOEFFLIN, Deceased. KENNETH G. HOEFFLIN, Respondent, v. LAVERNA HOLCOMBE, Appellant.

G. M. Cuthbertson for Appellant.

Guerin & Guerin for Respondent.

HERNDON, J.—Ida May Hoefflin died intestate on October 11, 1955, leaving as her only surviving heirs her daughter, Laverna Holcombe, and her son, Kenneth G. Hoefflin. Laverna was appointed administratrix of the estate. This contest arose between the son and the daughter upon the filing of her final account and petition for distribution which indicated that Kenneth owed the estate a total of $11,886. He filed objections in which he denied that he was so indebted. The probate court sustained Kenneth's position in substantial part, holding that his indebtedness was in the amount of $4,325. Laverna appeals from the order settling her account and decreeing distribution.

The major problem in this case is to determine to what extent respondent is actually indebted to the estate; that is to say, to what extent the following evidences of indebtedness, each of which was admittedly executed by respondent as obligor, represent valid, subsisting and enforceable obligations in the hands of the administratrix: (1) a promissory note in the principal amount of $4,886, naming decedent as

payee, dated July 9, 1954, payable on or before July 9, 1958, and bearing interest at 6 per cent; (2) a promissory note in the principal amount of $5,000, naming decedent as payee, dated August 21, 1954, payable one year from date, and bearing interest at 6 per cent; and (3) respondent's written acknowledgment of a loan of $2,000 made on August 15, 1955, and bearing interest at 6 per cent per annum.

The administratrix filed an inventory and appraisement showing an estate of a total appraised value of $21,481.15 consisting of the following items: (1) Cash—$1,197.79; (2) Balance due decedent on a contract for the sale of a residence described as 1505 Fairview Avenue, Wichita, Kansas, in the amount of $7,737.36; (3) Corporate stock valued at $660.04; and (4) the indebtedness in the total principal sum of $11,886 purportedly owing to the decedent by her son, respondent herein.

The account filed by the administratrix also showed respondent's indebtedness to the estate to be in the sum of $11,886 principal and interest computed to September 1, 1957, in the amount of $1,003.34. This indebtedness exceeded the appraised value of respondent's share of the other inventoried assets by $2,946.48. Appellant accordingly sought a decree distributing to her all of said other assets together with one of respondent's notes on which, as she suggested, a balance in the amount of $2,946.48 should be regarded as due and owing to her as distributee.

Respondent's main contention in support of his objections to the accounting was that "the promissory notes listed in the inventory and the purported obligation of the objector are all without consideration and of no force and effect and not a proper portion of the inventory of said estate." The trial court's finding in this respect is: "The inventory and appraisement, as reflected in the final accounting, should be reduced from $21,481.15 to the sum of $13,920.15, for the reason that the indebtedness of Kenneth G. Hoefflin to the estate shown as $11,886 should have been no more than $4,325. Said Kenneth G. Hoefflin is found to be indebted to the estate in the sum of $4,325 on the $5,000 note dated August 21, 1954. He is not indebted on either of the other notes, nor is he chargeable for interest on any of said notes."

Appellant's contention is that the foregoing finding not only is without evidentiary support, but is contrary to the evidence and erroneous as a matter of law. This contention is correct, as the following survey of the evidence will indicate.

The decedent was a widow. It is quite clear that it was her rather constant and definite purpose to treat her son and daughter alike in making certain *inter vivos* dispositions of her property. In 1947 she executed deeds conveying various parcels of real property situated in Kansas and Oklahoma to her children. To appellant she deeded a farm in Oklahoma referred to as the Arnett property, as well as certain residential lots in Wichita, Kansas. At the same time she deeded to her son a farm in Kansas referred to as the Colony property, and a residence property in Wichita known as 1505 Fairview Avenue. Prior to her death, decedent sold the Fairview Avenue property under a contract calling for a down payment of $5,000 and the balance in monthly installments. The balance due under this contract was listed in the inventory as above noted. Also, during her lifetime, decedent sold the residential lots in Wichita.

The decedent placed these various deeds in the hands of her daughter with instructions that they were not to be "registered" during her lifetime. The daughter kept the deeds in her safety deposit box. It seems rather clear that it was decedent's purpose to retain dominion and control over all these properties during her lifetime. The children evidently cooperated in effecting the sales of these properties that were made prior to decedent's death.

From time to time decedent purchased government bonds, taking some of them in the names of herself and appellant as coowners and others in the names of herself and respondent as coowners. It is fairly clear that she attempted to maintain an equality as between the two children in the purchases of these bonds. None of these bonds is in evidence, but they were apparently made out to "Ida May Hoefflin or Kenneth G. Hoefflin" or "Ida May Hoefflin or Laverna Holcombe" which is one of the ways in which such bonds may be held, that is, as coowners with right of survivorship. (See *Conrad* v. *Conrad*, 66 Cal.App.2d 280, 283-284 [152 P.2d 221] ; Civ. Code, § 704.) The trial court consistently referred to them as "joint tenancy bonds."

After decedent's death, her safety deposit box was opened and among the contents were bonds of $5,000 face value in the names of decedent and appellant and $4,500 in the names of decedent and respondent. Evidently the actual cash values of the bonds of which the two children were coowners respectively were substantially the same, the inheritance tax

appraiser having appraised both at something in excess of $3,900.

The evidence shows that the three items of respondent's indebtedness arose as follows: (1) the note for $4,886, dated July 9, 1954, was given in exchange for savings bonds issued in the names of decedent and respondent as coowners. (2) The $5,000 note dated August 21, 1954, represented cash in that amount which respondent admittedly received from decedent; and (3) the $2,000 item represented a $675 bond issued to respondent and decedent as coowners which he cashed and $1,325 in cash of which $675 came from the proceeds of a bond which had been issued to decedent in the names of herself and appellant as coowners.

As evidence of decedent's intent with reference to the $4,886 note, respondent introduced a letter dated June 2, 1954 (a little over a month before the date of the note) addressed to respondent in decedent's handwriting and containing among other things the following: ". . . When do you want a bond? made out to *me & Kenneth G. Hoefflin*—how large a bond? I'd rather give it to you now than to wait till I die—you understand? *bonds*—better pay some of your debts and stop interest—*bonds* don't pay much int. . . . Keep this letter for future proof (if necessary). . . ."

On the day after their mother's funeral, appellant and respondent prepared, and both signed, a memorandum received in evidence as Exhibit "E" which apparently was intended as a rough preliminary inventory of the estate, indicating estimated values of the assets and the face value of bonds which each child had received. This memorandum estimated the amount of respondent's loans at $9,400.

Appellant introduced in evidence a copy of a letter which she had written respondent under date of December 6, 1955, with reference to respondent's indebtedness to the estate. This letter states: ". . . Mother told me over and over that you were to pay back to her or the estate all money you had borrowed. It is now our problem to determine exactly what this amount is. This is what it looks like at present: . . ." She then listed what she believed to be the sums owing by respondent and asked him to "Please sign this page beside each number in the margin indicating it is O.K. and return it to me so that I can enter it in our account book and show it when needed." Several of the items were stricken out by respondent and appellant agreed that these items were cancelled out because she had received like sums. In the margin, beside the list-

ing of the three obligations hereinabove discussed, respondent wrote "Principal of loans. K. G. Hoefflin." On the reverse side of the letter he listed these three sums again, i.e., $4,886, $5,000 and $2,000, showing a total of $11,886. He shows the interest that he has paid, and the amount actually due, coming up with an interest overpayment of $150.26 which he deducts from the above sum, leaving a balance of $11,735.74, and writes: "This would be total and interest is paid on above amounts as listed."

Respondent returned to appellant the page of appellant's letter on which she had made her computation of his indebtedness to the estate, he having made the notations and corrections above mentioned. Also on the reverse side of this page, respondent wrote the following: "Yes I told Mom I'd pay 6% on this as it would be more than the bonds would pay. I certainly didn't know she was going to cash your bonds for 675 too honey but it is still better income for you than the bonds would be. Mother just said She had these bonds coming due and wanted to know if I could use the money at 6% as it would draw bigger interest and that is what I would have to pay at the bank so I took it. She suggested it and I have her letter suggesting that I take it. I didn't ask her for it. I bought lots with it which I haven't used yet but will in the near future."

The only other substantial evidence in the record which bears upon the intent of decedent and respondent with respect to the repayment of the loans is in the testimony of the parties. Appellant testified on cross-examination as follows: "Q. By MR. GUERIN: Did your mother ever mention to your during her lifetime the fact that she had cashed certain bonds in order to loan money to your brother? A. She didn't mention it, but she wrote it down. Q. Did she ever say anything to you about your brother owing her any money? A. Yes, she did, and she always said that was to be paid back into the estate before anything was to be divided." On direct examination respondent was asked: "Q. Did you ever have any conversation with your mother concerning whether or not these obligations would be paid?" to which he answered as follows: "THE WITNESS: I told her that I would like to give her a note on each of these and that I would pay her interest, and we agreed upon six per cent, as it would pay more interest than the bonds that she had the money in. It was her suggestion that I take the money and use it before her death."

The reasoning of the trial judge is indicated by his memorandum of decision reading in part as follows: "The evidence is clear that the decedent desired that her property be distributed, share and share alike, to her two children. This is an intestacy, and no will to this effect was ever probated, but this evidence is to be considered in interpreting the conflicting evidence as to what the decedent intended by certain transactions before her death.

"It is the opinion of the court that there was no intention that any interest be paid by the son after his mother's death. Of the notes on which it is alleged he is obligated to the estate, the note of $4886.00 was clearly the continuation of the joint tenancy arrangement with the intention that the decedent should receive interest for life and after her death, her son was not obligated. Therefore, the said alleged note dated July 9, 1954, is of no value. The same is true of $675.00 of the $5,000.00 note dated August 21, 1954, and the son is indebted to the estate only in the said principal sum. The alleged indebtedness of 8-15-56 for $2,000.00 was of the character of evidence of the son's liability to his mother for her life to pay interest and is not now binding on him.

"The evidence is clear on all his obligations up to and including the time of her death that the same are paid and that no interest is due after the date of death. Summarizing, the son is indebted to the estate for $4,325.00 and no more. This will be a lien against his inheritance and said sum will be considered in the assets of the estate and the estate will go ½ to the daughter and ½ to the son but from the son's inheritance will be deducted his inheritance of $4,325.00."

We have concluded that the findings of the trial court are without support in the evidence and that the theory upon which respondent was absolved from liability is legally unsustainable.

There is no evidence in the record to support the finding that respondent's indebtedness to the estate does not exceed $4,325. On the contrary, all the evidence, including respondent's own testimony and his statements after his mother's death, indicates that both respondent and his mother regarded the advances received by him as loans and as valid and subsisting obligations. It is most significant that at the hearing of this matter respondent testified to no fact tending to support the findings under discussion. When asked by his counsel whether he ever had any conversation with his mother as to "whether or not these obligations would be paid" his answer

was that at the time of each advance he had expressed his willingness to execute a promissory note and to pay interest. Since the undisputed evidence shows that respondent received not less than $6,325 in the form of cash, the trial court's figure of $4,325 is clearly erroneous.

Whether the balance of the $11,886 in issue should be regarded as due and owing from respondent would seem to depend upon the validity of the trial court's theory which respondent has adopted on this appeal: that since these funds resulted from the redemption of government bonds which had been held by decedent and respondent as co-owners, this money and the notes given by respondent to the decedent amounted to a "continuation of the joint tenancy arrangement with the intention that the decedent should receive interest for life and after her death, her son was not obligated." This theory was apparently derived from the principle that personal property acquired with joint tenancy funds retains its joint tenancy character. (*Harris Estate,* 169 Cal. 725, 728 [147 P. 967]; *Harris Estate,* 9 Cal.2d 649, 654 et seq. [72 P.2d 873]; *Fish* v. *Security-First National Bank,* 31 Cal.2d 378, 387 [189 P.2d 10]; *American Trust Co.* v. *Fitzmaurice,* 131 Cal.App.2d 382, 387 [280 P.2d 545]. See also 13 Cal.Jur.2d 293, Cotenancy, § 6, and cases cited therein.) Respondent further argued that insofar as his indebtedness arose from the delivery to him of bonds in which he had a joint tenancy interest, there was no consideration for his promise to repay. The crux of this theory is, of course, that after decedent's death, the notes, representing the proceeds of these bonds, became the property of respondent, by right of survivorship.

The theory of the trial court presupposes, of necessity, that the government bonds issued to "Mrs. Ida May Hoefflin or Kenneth G. Hoefflin" were in fact joint tenancy property. Such an assumption is, we feel, totally unwarranted by the evidence in the case.

Federal regulations have established that one of the ways in·which United States government bonds may be held is in the names of two persons in the alternative. (*Conrad* v. *Conrad, supra,* 66 Cal.App.2d 280, 284; 31 C.F.R. § 315.7.) The regulations of the Treasury Department provide that where a government bond is thus issued and one of the co-owners applies for payment, the obligation of the government to both is satisfied by payment to either. (31 C.F.R. § 315.60; *In re Hendricksen's Estate,* 156 Neb. 463 [56 N.W.2d 711, 719]; *In re Barletta's Estate* (N.Y. Surr. Ct.), 2 Misc. 135

[150 N.Y.S.2d 479, 482].)　　　In addition, where one of the coowners dies without having presented and surrendered the bond, the surviving coowner will be recognized as the sole and absolute owner. (Civ. Code, § 704; *Estate of Raphael,* 115 Cal.App.2d 525, 531 [252 P.2d 979].)

Where, as in the instant case, the bonds have been surrendered prior to the death of either coowner, section 704 has no application. (*Tobola* v. *Wholey,* 75 Cal.App.2d 351, 359 [170 P.2d 952].) And it has been held that the federal regulations regarding payment to either coowner go only to the relationship of the parties vis-a-vis the federal government, but do not preclude further examination of the actual relations between the coowners themselves. (*In re Hendricksen's Estate, supra; In re Barletta's Estate, supra;* see also *American Trust Co.* v. *Fitzmaurice, supra; Velleman* v. *Stern,* 134 Cal.App.2d 575 [285 P.2d 681].) In *In re Barletta's Estate, supra,* the court stated (at p. 484): "Jointly owned savings bonds have some of the earmarks of joint bank accounts which may be paid to either joint owner during their lifetime. As between the Treasury Department and the joint owners, payment to either of the joint owners is conclusive and discharges the government from further liability. However, the rights of the owners of the bonds, as between themselves, remain unaffected."

　　　To create a joint tenancy interest it is necessary to comply with Civil Code, section 683. (13 Cal.Jur.2d 296, Cotenancy § 9, and cases cited therein; and see *American Trust Co.* v. *Fitzmaurice, supra,* at 387.) Among the provisions of section 683 is a requirement that the intention to create a joint tenancy must appear expressly in the instrument which allegedly gives rise to it. (Civ. Code, § 683.) Without such a declaration, no joint tenancy results. (*Denigan* v. *San Francisco Savings Union,* 127 Cal. 142, 149 [59 P. 389, 78 Am.St. Rep. 35].)　　　The holding of government bonds in co-ownership does not, in and of itself, establish an intent to create a joint tenancy. (*American Trust Co.* v. *Fitzmaurice, supra;* and see *Velleman* v. *Stern, supra,* 134 Cal.App.2d 575, 579.)　　　Parol evidence remains admissible to show the intentions of the parties and the "realities of ownership." (*American Trust Co.* v. *Fitzmaurice, supra; Velleman* v. *Stern, supra; Paterson* v. *Comastri,* 39 Cal.2d 66, 72 [244 P. 2d 902].)

　　　In the case at bar, decedent, with her own money, purchased government bonds in the names of herself and

respondent. It appears that decedent made records of these bonds and, except for the transactions here involved, retained possession of them. In the instances where she cashed bonds and gave the money to respondent or delivered them to respondent and he cashed them, respondent executed promissory notes to decedent in the amounts delivered. All the evidence indicates that both decedent and respondent himself regarded these notes as valid and subsisting obligations. In this situation, it appears that, whatever the wording on the bonds, decedent's intent was to effectuate a means whereby such of the bonds as had not been used by her would vest in respondent at decedent's death. (*Cf. Velleman v. Stern, supra.*) The purchase of the bonds did not create a joint tenancy or constitute a completed gift. (*Cf. Velleman v. Stern, supra; Paterson v. Comastri, supra.*) This being the case, the bonds or proceeds therefrom delivered to respondent constituted a loan and the notes were executed in consideration therefor.

Respondent further maintains that, even if it is determined that the sums given by decedent to him were not completed gifts, they constituted advancements rather than loans and therefore, while includible for purposes of computing the extent of the estate, they do not have to be repaid to the extent to which they exceed respondent's intestate share. (Prob. Code, § 1051; and see *Estate of Nielsen,* 169 Cal.App.2d 297, 301, 305-306 [337 P.2d 174].) This contention is untenable.

■ No gift before death may be taken as an advancement unless such intention is expressed in writing by the donor or acknowledged as such in writing by the donee. (Prob. Code, § 1050; *Estate of Hayne,* 165 Cal. 568, 572 [133 P. 277, Ann. Cas. 1915A 926]; *Guardianship of Hudelson,* 18 Cal.2d 401, 407 [115 P.2d 805]; *Estate of Rawnsley,* 94 Cal.App.2d 384, 386-387 [210 P.2d 888]; *Estate of Nielsen, supra,* at 311.)

■ However, no special form of writing, not even the signature of the decedent, is required to constitute an advancement so long as the writing was done by the decedent and manifests an intention to charge the property given as an advancement, rather than as a gift or loan. (*Estate of Hayne, supra,* at 573; *Estate of Rawnsley, supra; Estate of Nielsen, supra,* at 311 et seq.)

As to any sums other than the $4,886 evidenced by the note of July 9, 1954, respondent points to no writing, either by decedent or by himself, indicating an intent to make an advancement. The only contemporaneous writings brought to our attention are a promissory note, dated August 21, 1954,

for $5,000, and a written acknowledgment of a loan of $2,000 made on August 15, 1955.

As to the remaining $4,886, respondent introduced "Exhibit I," a letter of June 2, 1954, written to him by decedent, and including the following language: ". . . When do you want a bond? made out to *me & Kenneth G. Hoefflin*— how large a bond? I'd rather give it to you now than to wait till I die—you understand?" Standing alone, these words might well be sufficient evidence of decedent's intent to advance, rather than lend, the $4,886. However, subsequent to this letter, at the time when decedent actually gave respondent the money, respondent executed a promissory note (dated July 9, 1954) wherein he agreed to repay the $4,886. Later correspondence between respondent and appellant contained respondent's written acknowledgment that the $4,886 constituted a loan which he had agreed to repay. In this situation, it is clear that, whatever may have been decedent's intent when she initially offered respondent the money, at the time when she delivered it to him, and thereafter until her death (during which period he paid her interest on all of the obligations), both decedent and respondent regarded the transaction as a loan and not an advancement. In this respect, the case at bar differs materially from *Estate of Nielsen, supra,* 169 Cal.App. 2d 297, wherein the decedent first loaned sums of money to her daughter and, subsequently, in a will and codicil, expressed an intention that such sums be treated as advancements rather than loans.

There is no merit in appellant's contention that the probate court erred "[i]n excluding from the estate a farm valued at $9,333.50 claimed by the son under a deed from the decedent, found in her effects after her death." The farm in question is located in Anderson County, Kansas. Although appellant did not include this Kansas property either in the inventory or in her accounting, she now apparently would contend that the probate court should have tried the issue of title raised by her assertion during the course of the hearing that the deed under which respondent claimed said property had never been delivered.

For at least two obvious reasons the disputed title to this Kansas real property may not appropriately be litigated in this probate proceeding. In the first place, it is the general rule that the probate court will not try title to property where it is claimed adversely by a party other than the personal representative. (*Laing* v. *Superior Court,* 88 Cal.

App.2d 641, 644 [199 P.2d 373] ; *Estate of Dabney,* 37 Cal.2d 672, 676 [234 P.2d 962] ; *Schlyen* v. *Schlyen,* 43 Cal.2d 361, 372, 373 [273 P.2d 897] ; *Central Bank* v. *Superior Court,* 45 Cal.2d 10, 14 [285 P.2d 906] ; *Schecter* v. *Superior Court,* 49 Cal.2d 3, 8 [314 P.2d 10] ; *Estate of Joslin,* 165 Cal.App.2d 330, 344 [332 P.2d 151] ; *Estate of Hart,* 51 Cal.2d 819, 823-824 [337 P.2d 73] ; but *cf. Robison* v. *Sidebotham* (9 Cir.) 243 F.2d 16, 22.) In the application of this rule, the only persons who are deemed in privity with the estate are the executor or administrator and claimants who have acquired the property involved in the course of probate proceedings. (*Central Bank* v. *Superior Court, supra,* at 15-16 ; *Schecter* v. *Superior Court, supra,* at 8-9.)

 In the second place, it is elementary that title to real property ordinarily may be determined only by the courts of the state in which it is situated. (*Taylor* v. *Taylor,* 192 Cal. 71, 76 [218 P. 756, 51 A.L.R. 1074] ; *Getty* v. *Getty,* 130 Cal.App. 519, 520 [20 P.2d 82] ; *Launer* v. *Griffen,* 60 Cal. App.2d 659, 668 [141 P.2d 236].) And while a court having *in personam* jurisdiction of the parties may compel conveyance of land outside its territorial jurisdiction (*Taylor* v. *Taylor, supra*), the *in rem* proceedings of the probate court are not designed for the litigation of such issues or the granting of such relief. We were informed by counsel at oral argument that litigation had been instituted in the courts of Kansas to determine the title to this property.

 Finally, we must reject appellant's contention that the court below erred in refusing to allow counsel for the administratrix extraordinary fees for services allegedly rendered in connection with certain ancillary proceedings in the State of Kansas. The allowance of extraordinary fees for such services is a matter of discretion, and the present record fails to disclose any abuse of that discretion. (*Estate of Turner,* 50 Cal. App.2d 332, 335 [123 P.2d 66].)

The order under review is reversed and the cause is remanded for further proceedings consistent with this opinion.

Fox, P. J., and Ashburn, J., concurred.